**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ISELA V. MARQUEZ and FERNANDO MARQUEZ, as plenary co-guardians of CHLOE MARQUEZ, a disabled person, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No.: 21-cv-3357 |
| BOARD OF TRUSTEES OF THE UNIVERSITY OF ILLINOIS, | ) ) ) | Plaintiff Demands Trial by Jury |
| Defendant. | ) ) | |

**SECOND AMENDED COMPLAINT**

Isela and Fernando Marquez, not individually, but as plenary co-guardians for their daughter Chloe Marquez ("Plaintiff," and sometimes "Chloe"), by their attorneys, Jennifer M. Sender, Andrés J. Gallegos and Andrés J. Gallegos, II, of Robbins DiMonte, Ltd., for their Second Amended Complaint against Defendant Board of Trustees of the University of Illinois ("Board"), doing business as UI Health ("Defendant" or sometimes "UI Health"), state as follows:

**INTRODUCTION**

1.      In June 2019, Chloe experienced two mental health crises requiring inpatient treatment. For one mental health crisis admission was sought at Defendant UI Health, a hospital that represents to the public its mission is to advance healthcare to improve the health of its patients, communities, and to promote health equity. As the Marquez family learned, UI Health's mission to promote health equity has limits. After determinations were made that Chloe needed inpatient mental health care because of suicidal ideation, she was denied admission to UI Health's

behavioral unit. The basis for the denial, ironically, was the crux of Chloe's mental health crisis – her cerebral palsy, wheelchair use and use of a gastronomy tube.

## JURISDICTION AND VENUE

2.      This court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 as the Plaintiffs' claims alleged herein arise under Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12181–12189; Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794, *et seq*.; and Section 1557 of the Patient Protection and Affordable Care Act ("Section 1557"), 42 U.S.C. § 18116. Injunctive relief is authorized by Rule 65 of the Federal Rules of Civil Procedure.

3.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b). All of the events or omissions giving rise to Plaintiffs' claims occurred here in this district.

## THE PARTIES

4.      Plaintiff Chloe Marquez is 22-years old and has been living with the effects of cerebral palsy since birth, has dysphagia and utilizes a gastronomy tube. Chloe is a person with a disability within the meaning of all applicable statutes. Chloe resides in Orland Park, Illinois, with her parents. Isela and Fernando Marquez, her parents, are her legal guardians.

5.      Isela V. Marquez and Fernando Marquez are the co-Guardians of Chloe Marquez, a disabled person, as appointed by order duly entered on August 10, 2017, by the Circuit Court of Cook County, IL, County Dept. – Probate Division, No, 2017 P 003497.

6.      Defendant Board of Trustees of the University of Illinois ("Board") exercises final authority over the University of Illinois ("University"), doing business as UI Health, which includes the hospitals and healthcare system operated by the University. The University operates

a Medicare and Medicaid enrolled acute-care hospital and other healthcare related services in Chicago, Illinois.

7.      University, doing business as UI Health, operates a clinical enterprise that includes a 462-bed tertiary care hospital, 21 outpatient clinics, and 14 Mile Square Health Centers facilities, which are Federally Qualified Health Centers. UI Health is a patient centered organization that provides safe, high-quality, and cost-effective care for its patients. In its provision of behavioral health and mental health services, UI Health utilizes a multidisciplinary team of experts including psychiatrists, neurologists, occupational therapists, and social workers. UI Health treats the following mental health conditions: anger management; anxiety; attention deficit disorder; bipolar disorder; depression; eating disorders; learning disabilities; mood changes; obsessive compulsive disorder; panic disorder; post-traumatic stress; schizophrenia; sleep disorder; and substance abuse.

8.      University, doing business as UI Health, receives federal financial assistance in the form of Medicare and Medicaid reimbursement. Accordingly, University, doing business as UI Health, is a recipient of federal financial assistance within the meaning of the Rehabilitation Act and is a covered entity under Section 1557.

**EXPERIENCES OF PLAINTIFF CHLOE MARQUEZ
AND DEFENDANT'S CONDUCT**

9.      Suicide is a global public health concern, claiming more than 1 million lives each year. Bohanna, I.  Suicide "contagion": what we know and what we need to find out. *CMAJ*. 2013;185(10):861-862. In the United States, suicide is the tenth leading cause of death, and the suicide rate increased 35% from 1999 through 2018. Rockett IR, Regier MD, Kapusta ND, *et al.* Leading causes of unintentional and intentional injury mortality: United States, 2000-2009. *Am J Public Health*. 2012;102(11):e84-e92. In 2018, suicide was the second leading cause of death

among individuals between the ages of 15 and 24 in the United States. https://www.cdc.gov/injury/images/lc-charts/leading_causes_of_death_by_age_group_2018_1100w850h.jpg. According to the National Institute of Mental Health, two main risk factors for suicide are a history of suicide attempts and depression or other mental health disorders. https://www.nimh.nih.gov/health/publications/suicide-faq. A 2021 study established that people with various types of functional disabilities had an elevated risk for suicide-related outcomes, compared with people without disabilities, and that the more limitations a person had progressively increased their risk. Marlow, N, Xie, Z, Tanner, R, *et al.* Association Between Disability and Suicide-Related Outcomes Among U.S. Adults, *American Journal of Preventative Medicine*, 2021; 61(6):852-862. Based on these findings, the authors called for focused attention to the mental health of people with disabilities, including suicide prevention efforts that accommodate their needs. *Id.* People who attempt suicide by hanging, drowning, shooting by firearm, or jumping from a height are at substantially higher risk for completed suicide in the short and long term. Runeson, B, Tidemalm, D, Dahlin, M, *et al*. Method of attempted suicide as predictor of subsequent successful suicide: national long term cohort study. *BMJ* 2010; 341.

10.     For many years, Chloe Marquez has had a medical history of depression and a suicide attempt by hanging, which has heretofore and will likely from time to time require intervention or treatment on an inpatient hospitalization basis. Chloe's depression, physical disabilities, and prior suicide attempt by hanging place Chloe with a significantly higher risk of another attempt of suicide and death by suicide. *See* Paragraph 9. UI Health is approximately 29 miles from Chloe's residence and accepts her health insurance for payment of hospital bills. Upon

UI Health's compliance with its federal nondiscrimination mandates, Chloe intends to seek inpatient care at UI Health's hospital.

11.     As a result of Chloe's cerebral palsy, she requires the use of a power wheelchair for mobility. She can ambulate only short distances, up to 100 feet with a walker. She can operate her wheelchair on her own. Chloe can stand with assistance. She requires assistance transferring from her wheelchair onto a bed, but she can independently transfer from and to her wheelchair and toilet. As a result of her dysphagia, Chloe follows a puree diet. Once her food is set up for her, she can feed herself for approximately 10 minutes before becoming fatigued, at which point she requires assistance. From and after August 2018, she has required, does now require, and will hereafter require the use of a Gastrostomy Tube ("G-Tube") for supplemental nutrition. Chloe receives water and medication through the G-Tube. Chloe can brush her teeth, bathe, and groom herself with assistance. She can also dress herself with standby assistance. As a further result of her dysphasia, she utilizes an iPad to communicate using text-to-speech and, at times, a symbol-supported communications application. Chloe can type on the iPad keyboard only by using her thumbs.

12.     On or about April or May of 2019, Mr. and Mrs. Marquez took Chloe to a Silver Oaks Behavioral Hospital, which is near their home, to seek admission of Chloe, because she was demonstrating behavior concerning to her parents. Hospital staff advised Mrs. Marquez that they could not admit Chloe because the hospital did not have the staff and could not assist Chloe due to her use of a wheelchair. Chloe was stabilized at a nearby emergency department.

13.     On or about June 13, 2019, Mr. and Mrs. Marquez took Chloe to Palos Hospital, which has a behavioral health unit and which is also near their home, for her increasingly concerning behavior attributed to Cerebral Palsy and depression. Again, she was denied admission

to the behavioral health unit as the hospital determined she was "not a candidate for admission" despite the hospital confirming a diagnosis of depression anxiety situational reaction. The behavioral health intake employee told Mrs. Marquez that the hospital could not help Chloe because she uses a wheelchair and a G-Tube.

14.     On June 22, 2019, Mrs. Marquez noticed a linear abrasion on Chloe's neck. When asked about the abrasion, Chloe admitted that she had recently attempted suicide. Mrs. Marquez immediately telephoned Chloe's psychiatrist requesting guidance on what to do and where to take Chloe for assistance. Chloe's psychiatrist never responded. Mr. Marquez watched over Chloe all night.

15.     The next day, June 23, 2019, Chloe was demonstrating behavior concerning to her parents. Mrs. Marquez was able to speak with Chloe's psychiatrist who instructed Mrs. Marquez to take Chloe to Northwestern Memorial Hospital's ("NMH") emergency department. Before going to NMH, Mr. and Mrs. Marquez attempted to have Chloe admitted to Lurie Children's Hospital. Because of age limitations, Lurie Children's Hospital declined admission and arranged for Chloe to be seen at NMH. While in the emergency department at NMH, Chloe was evaluated by NMH's psychiatry acute crisis intervention team who learned that Chloe was having suicidal ideations for two weeks commencing June 10, 2019.

16.     Given Chloe's worsening depression, suicide attempt and other behaviors, NMH's crisis intervention team recommended psychiatric inpatient admission, and prepared a petition for her involuntary admission. A crisis intervention team social worker commenced a search for a mental and behavioral health hospital to admit Chloe.

17.     Over the next several excruciating days, NMH's crises intervention team attempted to find an inpatient placement for Chloe and contacted ten mental and behavioral health hospitals

or hospitals with units in the Chicago metropolitan area and the suburbs. Chloe was rejected by all of the hospitals, including UI Health. That rejection by the hospitals increased Chloe's depression and anxiety.

18.     On June 25, 2019, Pamela Costis, a crisis intervention team social worker at NMH, telephoned UI Health but did not receive a response. On June 27, 2019, Ms. Costis followed up with UI Health and was told Chloe could not be accepted "due to high acuity already on [the] unit, [patient's] aggression, and [patient's] limited ability to communicate." Northwestern Medicine Medical Records for Chloe Marquez June 23 – July 3, 2019 so state.

19.     Despite being at high risk for re-attempt of suicide and death by suicide, Chloe and her guardians were unable to find any hospital to accept her for inpatient psychiatric care. Given that she is at high risk for re-attempt of suicide and death by suicide, Chloe and her guardians are fearful and reasonably certain that when Chloe needs inpatient behavioral and mental health care in the future, which by the nature of severe depression cannot be forecasted, she will again be rejected and denied what could be life-saving care. There is a reasonably strong likelihood that Chloe will face this pattern of rejection in the future. Accordingly, Plaintiffs must now be able to find a hospital that will accept patients, like Chloe, with physical disabilities. As such, if Chloe is required to travel farther from her home for such treatment than she would typically for health care providers, that is what she intends to do to find the treatment she needs. Although traveling 29 miles for hospital care could be unreasonable for other individuals, for Chloe it is not unreasonable given the life and death circumstances described herein.

20.     In denying access to its services and facilities to persons with physical disabilities and who utilize mobility devices, like Chloe, UI Health is discriminatorily cherry-picking its patients.

4168310 (14677.2)

## COUNT I

## VIOLATION OF THE AMERICANS WITH DISABILITIES ACT, 42 U.S.C. § 12131

21.     Plaintiff incorporates by reference paragraphs 1 through 20, as if fully set forth herein.

22.     Plaintiff's claims in Count I arise under the Americans with Disabilities Act, 42 U.S.C. §§ 12101 – 12189 (the "ADA"), and its implementing regulations under Title III, applicable to public accommodations, 28 C.F.R. §§ 36.101 – 36.608, which provide in pertinent part as follows:

A.     No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation. 42 U.S.C. § 12182(a); 28 C.F.R. § 36.201.

B.     It shall be discriminatory to subject an individual on the basis of a disability or disabilities of such individual, directly, or through contractual, licensing, or other arrangements, to a denial of the opportunity of the individual to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of an entity. 42 U.S.C. § 12182(b) (1)(A)(i); 28 C.F.R. § 36.202(a).

C.     It shall be discriminatory to fail to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations. 42 U.S.C. § 12182(b) (2)(A)(ii); 28 C.F.R. § 36.302(a).

D.     A public accommodation shall not impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any goods, services, facilities, privileges, advantages, or accommodations, unless such criteria can be shown to be necessary for the provision of the goods, services, facilities, privileges, advantages, or accommodations being offered. 42 U.S.C. § 12182(b)(2)(A)(i); 28 C.F.R. § 36.301(a).

E.     A public accommodation may impose legitimate safety requirements that are necessary for safe operation. Safety requirements must be based on actual risks and

not on mere speculation, stereotypes, or generalizations about individuals with disabilities. 28 C.F.R. § 36.301(b).

F.     A public accommodation shall remove architectural barriers in existing facilities, including communication barriers that are structural in nature, where such removal is readily achievable, *i.e.*, easily accomplishable, and able to be carried out without much difficulty or expense. 28 C.F.R. § 36.304(a).

G.     The term "public accommodation," as used in the statute, includes hospitals. 42 U.S.C. § 12181(7)(F); 28 C.F.R. § 36.104.

23.     As a hospital, the Defendant is a public accommodation and subject to the requirements of Title III of the ADA.

24.     Chloe did not seek admission to the Hospital for medical care associated with her cerebral palsy. Chloe does not seek to expand the scope of the Hospital's existing behavioral health services. Chloe only wants to obtain its benefits. The Hospital has a legal obligation to modify its policies, practices and procedures to allow for the admission of otherwise qualified patients who utilize mobility devices, like Chloe, and to provide the required assistance with her activities of daily living, as doing so will not result in a fundamental alteration to the nature of its behavioral health services. 42 U.S.C. § 12182(b) (2)(A)(ii); 28 C.F.R. § 36.302(a).

25.     Defendant has statutory and regulatory obligations to remove architectural barriers where such removal is readily achievable to permit barrier free access to its facilities for persons who utilize mobility devices, like Chloe.

26.     The acts and omissions of the Defendant violated and continue to violate the ADA and its implementing regulations in one or more or all the following manners, as Defendant has discriminated against Chloe in one or more or all of the following respects:

A.     Denying her the opportunity for the full and equal enjoyment of Defendant's services and facilities on the basis of her physical disabilities.

B.     Denying her the opportunity to participate in or benefit from Defendant's services and facilities on the basis of her physical disabilities.

C.     Utilizing admission criteria that screens her out from fully and equally enjoying its services and facilities.

D.     Denying her the opportunity to participate in or benefit from Defendant's services and Facilities based upon a general assessment of a perceived safety risk by her utilization of a wheelchair.

E.     Failing to make reasonable modifications in its policies, practices, or procedures, which are necessary to afford Defendant's services and facilities to her where such modifications would not fundamentally alter the nature of its services.

F.     Failing to remove architectural barriers where such removal is readily achievable to permit her to access its facilities the purposes of utilizing its services.

G.     Otherwise discriminating against Chloe because of her disabilities.

27.     Defendant's conduct constitutes ongoing and continuing violations of the ADA. Unless restrained from doing so, Defendant will continue to violate the ADA. This conduct, unless enjoined, will continue to inflict injuries on Chloe, for which she has no adequate remedy at law. Therefore, pursuant to section 308 of the ADA (42 U.S.C. § 12188), Plaintiff is entitled to injunctive relief.

28.     Plaintiff is entitled to reasonable attorney's fees and costs, pursuant to 42 U.S.C. § 12205.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for the following relief:

A.     An order enjoining Defendant from discriminating against the Plaintiff, requiring Defendant to (i) adopt and implement an inpatient admissions policy that does not screen out patients with physical disabilities; (ii) make available qualified staff to assist Plaintiff with her activities of daily living, as needed; (iii) provide its appropriate employees training on the foregoing admissions policy; (iv) provide its appropriate employees with disability cultural competency training; and (vi) remove existing architectural barriers where readily achievable;

B.   A declaration that Defendant in denying Plaintiff access to its facilities and services discriminates against the Plaintiff and that Defendant fails to have a nondiscriminatory admission policy as required by law;

C.   An award of attorneys' fees and costs; and

D.   Such other relief as the Court deems just.

## COUNT II

### VIOLATION OF SECTION 504 OF THE REHABILITATION ACT OF 1973, 29 U.S.C. § 704

29.   Plaintiff incorporates by reference paragraphs 1 through 20, as if fully set forth herein.

30.   At all relevant times herein, Defendant received federal financial assistance in the form of reimbursement from the federal Medicare and Medicaid programs. As a result, Defendant is subject to the antidiscrimination provisions of Section 504, as herein described.

31.   At all times relevant, there was in full force and effect a statute known as the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et sequitur*, and its implementing regulations, 45 C.F.R. § 84.4(a). The Section 504 implementing regulation provides that "[n]o qualified handicapped person shall, on the basis of handicap be excluded from participation in, be denied the benefits of or otherwise be subjected to discrimination under any program or activity which receives or benefits from Federal financial assistance." 45 C.F.R. § 84.4(a). The regulation further provides:

A.   A recipient, in providing any aid, benefit, or service, may not, ... on the basis of handicap: (ii) Afford a qualified handicapped person an opportunity to participate in or benefit from the aid, benefit or service that is not equal to that afforded others ... 45 C.F.R. § 84.4(b)(1)(ii).

B.   A recipient may not, directly or through contractual or other arrangements, utilize criteria or methods of administration (i) that have the effect of subjecting qualified handicapped persons to discrimination on the basis of handicap ... 45 C.F.R. § 84.4(b)(4).

C.       In providing health, welfare or other social services or benefits, a recipient may not on the basis of handicap: … (2) Afford a qualified handicapped person an opportunity to receive benefits or services that is not equal to that offered non-handicapped persons. 45 C.F.R. § 84.52(a)(2).

D.       A definition for "handicapped person" as any person who: "(i) has a physical or mental impairment which substantially limits one or more major life activities, (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment." 45 C.F.R. § 84.3(j)(l)(i)-(iii).

E.       A definition for "qualified handicapped person," with respect to the provision of health, welfare and social services, as a person "who meets the essential eligibility requirements for the receipt of such services." 45 C.F.R. § 84.3(k)(4).

F.       A recipient shall operate its program or activity so that when each part is viewed in its entirety, it is readily accessible to handicapped persons… 45 C.F.R. § 84.22(a).

32.     Chloe is a qualified person with disabilities who met the essential eligibility requirements for receipt of Defendant's behavioral health services, as she suffered from depression. Further, NMH's psychiatry crisis intervention team determined psychiatric inpatient admission was required. The services she sought were directly within Defendant's scope of services offered. But for Chloe's physical disabilities, namely, being nonverbal, non-ambulatory, her use of gastronomy tube and requiring assistance with activities of daily living, Defendant would have accepted Chloe as a patient.

33.     Through the acts and omissions alleged herein, Defendant has, solely on the basis of Plaintiff's disabilities, denied Plaintiff access to its services and facilities, excluded Plaintiff from participating in its services, denied Plaintiff the benefit of its services and subjected Plaintiff to discrimination in violation of 29 U.S.C. § 794. *et seq*., and the regulations promulgated thereunder, all of which have resulted in injury to Plaintiff. *See, Bowen v. American Hospital Association,* 476 U.S. 610 (1986) (Section 504 does entitle handicapped individuals to 'meaningful access' to medical services).

34.     Defendant's discriminatory refusal to accept Chloe as a patient, on the basis of her physical disabilities, was intentional and done so with deliberate indifference as to Chloe's federally protected civil and legal rights.

35.     Defendant's acts and omissions alleged herein violated Section 504 and its implementing regulations and discriminated against Chloe in one or more or all of the following respects:

A.     Denying her meaningful access to its mental health services.

B.     Denying her the opportunity for the full and equal enjoyment of its services and facilities owned, operated, and/or contracted for use by Defendant.

C.     Denying her the opportunity to participate in or benefit from its services and facilities, privileges, advantages, or accommodations.

D.     Acting intentionally and with deliberate indifference by denying Plaintiff access to its services and facilities.

E.     Otherwise discriminating against the Plaintiff.

36.     Section 505(a)(2) of the Rehabilitation Act, 29 U.S.C. § 794(a)(2), states that the "remedies, procedures and that the rights set forth in title VI of the Civil Rights Act of 1964 [being 42 U.S.C. § 2000(d) *et sequitur*] shall be available" for violations of section 504 of the Rehabilitation Act. By law, such remedies include compensatory monetary damages. *Barnes v. Gorman*, 536 U.S. 181 (2002).

37.     As a proximate result of Defendant's violations of Section 504, Defendant has inflicted injury and damages upon the Plaintiff, including loss of a civil right, mental anguish, humiliation and mental pain and suffering.

38.     Plaintiff is entitled to reasonable attorneys' fees and costs, pursuant to section 505(b) of the Rehabilitation Act, 29 U.S.C. § 794a.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief:

A.      An order enjoining Defendant from discriminating against the Plaintiff, requiring Defendant to (i) adopt and implement a legally compliant admissions policy, practices and procedures; (ii) make available qualified staff to assist Plaintiff with her activities of daily living, as needed; (iii) provide its appropriate employees training on its aforementioned admissions policy; (iv) provide its appropriate employees disability cultural competency training; and (v) remove existing architectural barriers where readily achievable;

B.      A declaration that Defendant in denying access to its facilities and services discriminates against the Plaintiff and that Defendant fails to have an admission policy as required by law;

C.      An award of compensatory monetary damages;

D.      An award of attorneys' fees and costs; and

E.      Such other relief as the Court deems just.

## COUNT III

### VIOLATION OF SECTION 1557 OF THE PATIENT PROTECTION AND AFFORDABLE CARE ACT, 42 U.S.C. § 18116

39.     Plaintiff incorporates by reference paragraphs 1 through 20, as if fully set forth herein.

40.     At all relevant times herein, there was in full force and effect a statute known as the Patient Protection and Affordable Care Act (the "Affordable Care Act"), 42 U.S.C. § 18001, *et seq.* Section 1557 of the Affordable Care Act prohibits discrimination on the basis of race, color, national origin, sex, age, or disability in certain health programs and activities. 42 U.S.C. § 18116. Section 1557's implementing regulations, 45 C.F.R. §§ 92.1 – 92.203, effective as of July 18, 2016, apply to health programs or activities administered by recipients of Federal financial assistance from the Department of Health and Human Services.

41.     Defendant is a participating provider in the Medicare and Medicaid programs and as a result, thereof, it is a covered entity under Section 1557.

42.     The implementing regulations of Section 1557 prohibit discrimination against an individual on the basis of disability, *inter alia*, and prohibit an individual from being excluded from participation in, denied the benefits of, or otherwise be subjected to discrimination under any health program or activity. 45 C.F.R. § 92.101(a)(1).

43.     The aforesaid regulations require covered entities to comply with the accessibility standards for buildings and facilities set forth in the 1991 Standards or the 2010 Standards. 45 C.F.R. § 92.203(a)&(b). The "1991 Standards" means the 1991 ADA Standards for Accessible Design, published at appendix A to 28 CFR part 36 on July 26, 1991, and republished as appendix D to 28 CFR part 36 on September 15, 2010. *See* 45 C.F.R. § 92.4. The "2010 Standards" means the 2010 ADA Standards for Accessible Design, as defined at 28 CFR § 35.104.

44.     Those aforesaid regulations also require a covered entity to make reasonable modifications to its policies, practices, or procedures when such modifications are necessary to avoid discrimination on the basis of disability, unless the covered entity can demonstrate that making the modifications would fundamentally alter the nature of the health program or activity. 45 C.F.R. § 92.105.

45.     Defendant's discriminatory refusal to accept Chloe as a patient on the basis of her physical disabilities, namely, being nonverbal, non-ambulatory, her use of gastronomy tube and requiring assistance with activities of daily living, was intentional and done with deliberate indifference as to Chloe's federally protected civil and legal rights.

46.     Defendant's acts and omissions alleged herein violated Section 1557 and its implementing regulations and discriminated against Plaintiff in one or more or all of the following

respects:

    A.     Denying her meaningful access to its mental health services.

    B.     Denying her the opportunity for the full and equal enjoyment of its health program or activity.

    C.     Denying her the opportunity to participate in or benefit from its services and facilities, privileges, advantages, or accommodations.

    D.     Acting intentionally and with deliberate indifference by denying Plaintiff access to its services and facilities.

    E.     Failing to make reasonable modifications in its policies, practices, or procedures, which are necessary to afford Defendant's services and facilities to her where such modifications would not fundamentally alter the nature of its services.

    F.     Failing to remove architectural barriers where such removal is readily achievable to permit her to access its facilities the purposes of utilizing its services.

    G.     Otherwise discriminating against Chloe.

47.     Section 1557's implementing regulations provide that the enforcement mechanisms available for and provided under Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act, *inter alia*, shall be available for purposes of Section 1557 as implemented by this part, and "compensatory damages for violations of Section 1557 are available in appropriate administrative and judicial actions brought under this rule." 45 C.F.R. § 92.301.

48.     Defendant's conduct constitutes ongoing and continued violations of Section 1557. Unless restrained from doing so, Defendant will continue to violate Section 1557. This conduct, unless enjoined, will inflict injuries on Plaintiff for which she will have no adequate remedy at law.

49.     Section 505(a)(2) of the Rehabilitation Act, 29 U.S.C. § 794(a)(2), states that the "remedies, procedures and that the rights set forth in title VI of the Civil Rights Act of 1964 [being

42 U.S.C. § 2000(d) *et sequitur*] shall be available" for violations of section 504 of the Rehabilitation Act. By law, such remedies include compensatory monetary damages. *Barnes v. Gorman*, 536 U.S. 181 (2002).

50.     As a direct and proximate result of the foregoing, Plaintiff suffered the loss of a civil right and she suffered great mental anguish; and she will continue so to suffer for a long time in the future; and Plaintiff was otherwise injured and damaged.

51.     Plaintiff is entitled to reasonable attorneys' fees and costs, pursuant to section 505(b) of the Rehabilitation Act, 29 U.S.C. § 794a.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief:

A.     An order enjoining Defendant from discriminating against the Plaintiff, requiring Defendant to (i) adopt and implement a legally compliant admissions policy, practices and procedures; (ii) make available qualified staff to assist Plaintiff with her activities of daily living, as needed; (iii) provide its appropriate employees training on its aforementioned admissions policy; (iv) provide its appropriate employees disability cultural competency training; and (v) remove existing architectural barriers where readily achievable;

B.     A declaration that Defendant in denying access to its facilities and services discriminates against the Plaintiff and that Defendant fails to have an admission policy as required by law;

C.     An award of compensatory monetary damages;

D.     An award of attorneys' fees and costs; and

E.     Such other relief as the Court deems just.

Dated: February 21, 2022                    Isela and Fernando Marquez, plenary co-guardians of
                                            Plaintiff Chloe Marquez

                                            /s/ Jennifer M. Sender

                                            _____
                                            One of Her Attorneys


Jennifer M. Sender (ARDC No. 6207774)
Andrés J. Gallegos (ARDC No. 6212168)
Andrés J. Gallegos, II (ARDC No. 6337849)
Attorneys for Plaintiff Chloe Marquez
ROBBINS DIMONTE , LTD.
180 N. LaSalle Street, Suite 3300
Chicago, Illinois 60601
(312) 782-9000 - Telephone
(312) 782-6690 - Facsimile
jsender@robbinsdimonte.com
agallegos@robbinsdimonte.com
agallegosii@robbinsdimonte.com

18

4168310 (14677.2)